## Laterza v. Laterza, Appellant.

Argued October 7, 1936.

Before KELLER, P. J., CUNNING-

104

HAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*C. James Todaro,* for appellant.

*I. Irving Tubis,* for appellee.

OPINION BY STADTFELD, J., November 19, 1936:

The parties to this divorce proceeding were married on the 10th day of January, 1921, at Philadelphia. Immediately after their marriage, they resided together at 906 Kimball St., from where they moved to 518 Washington Ave., Philadelphia. The libellant was born in the City of Philadelphia where he lived during his whole lifetime, and at the time of the hearing was thirty-seven years old. The respondent was born in the province of Salerno, Italy, and when four years of age came to Philadelphia, where she has lived ever since, and at the time of the hearing was twenty-eight years old.

The libellant's occupation is that of a carpenter, employed at the Victor Talking Machine Company as a hardwood fitter. The respondent for a time, worked in a shoe repair factory and, generally, at whatever work she could get.

There were two children born as a result of this

marriage, two boys: Frank Laterza, eight years of age, and Carlo Laterza, four years of age, both residing with the respondent at 919 Kimball Street.

The libel charges wilful and malicious desertion on the part of the respondent from on or about the 14th day of July, 1930, and that the same has been persisted in during the term and space of two years and upwards. The libel also charges that the respondent has subjected the libellant to such indignities to his person as to render his condition intolerable and life burdensome, and that such conduct began on or about the first day of September, 1929.

Respondent filed an answer, denying the causes set forth in the libel. A master was appointed, who, after hearing the testimony, filed a report in which he found that the respondent deserted libellant on the 14th day of July, 1930, while they were residing at 518 Washington Ave., Philadelphia, and that the desertion has been continuous since that date, and recommended a divorce on that ground. No testimony was offered to substantiate the ground of indignities. Exceptions to the master's findings and recommendation, were filed by the respondent, but overruled by the court and a divorce granted. The respondent appealed.

The testimony on behalf of libellant shows that in December, 1929, or early in 1930, the respondent went from the common domicile to the home of her parents, 919 Kimball St., on account of the illness of their son. This was agreeable to libellant who visited his wife and children daily, taking some of his meals and occasionally spending the night there. The home of respondent's parents, which had five bedrooms, was occupied at the time by respondent's father and mother, three brothers, aged 26, 20 and 13 years of age, respectively, three sisters, aged 15, 10 and 8 years, a boarder, respondent and her two children, and libellant when he happened to be there.

The home on Washington Ave., where the libellant and respondent had resided together was a large home, well furnished by the libellant. This home was purchased by libellant about one year after the marriage. The deed originally was in libellant's name, but subsequently was put in the name of both libellant and respondent. Libellant was a steady worker and of saving disposition. He turned his earnings over to his wife, who deposited them in the bank, in their joint names. Respondent remained at the home of her parents from December, 1929, until the present time.

While living at her mother's home, a boarder, one, Martinelli, also resided there. Libellant observed on several occasions incidents that led to a suspicion that an intimacy existed between respondent and the boarder. Libellant testified that he did not tell anyone of his suspicion, although he mentioned it at the Municipal Court, where respondent had instituted proceedings for support. There was no evidence to support this suspicion and the master gave no consideration thereto.

It further appeared that while living at Washington Ave., the respondent developed a chest ailment which the doctor, who appeared on her behalf, described as chronic bronchitis, T. B. of the apex. She received medical aid through this physician and also at the Jefferson Hospital Chest Clinic. She received injections and was required to report to the hospital regularly for the injections. On July 14, 1930, when the wife and child got sufficiently well, after some six month's residence at her mother's home, libellant requested her to return with him to their own home on Washington Ave. Respondent refused to return and remained at her mother's home. He testified: "On July 14, I told her to come home and she would not come home and I went home alone. On July 17th I went home and I worked and in the meantime when

I came home, she came to my house and she broke up the dishes and said she would shoot me." She admitted breaking the dishes. He repeatedly personally asked her to return and even sought the intervention of the Domestic Relations Division of the Municipal Court in his efforts to induce his wife to return. Libellant testified that he also sought her return through several people, but did not meet with success in his efforts. Mr. Briamonte testified that he is the godfather of one of the children; that after the separation, the libellant came to him and told him that his wife refused to live with him, and he went to the respondent to make peace and ask her to return to her husband. She said she would not come back. "She said she would not come back because he applied to the Court to have her come back to him, the reason she would not come back to him that was her reason, she would not come back if he was the last man on earth. ...... "Q. There was nothing said that time about her health? A. No, sir."

The other witness on behalf of the libellant, Mr. Larcorcio, an uncle of libellant, testified that he had gone to the home of respondent's parents and spoke to her, asking her to return to the libellant, but that she only said "No", assigning no reason other than she could not get along with the libellant's people who lived nearby. He was also asked whether any mention as to the respondent's health was made, to which he answered, "No complaint about being sick."

At the time that these requests for her to return to the libellant were made, there is nothing to indicate that the treatments she was getting at the hospital could not as readily have been had if living at the home maintained by libellant. She was at no time confined to bed, and the only treatments she received were the injections given her at the hospital. During this very time, respondent admitted that she worked for

several months at the Victor Talking Machine Company.

During all of this period, libellant had not removed from, or given up his home on Washington Ave., but maintained the same, so that respondent could have returned at any time. Libellant admitted that in August, 1930, he had removed the furniture from the first to the third floor, but stated that it was taken back to the first floor where it belonged a few months afterwards, and that a parlor suite had been moved to his sister's home for safe-keeping.

Respondent admitted the requests for her return had been made by libellant, but attempted to justify her failure to return home, as she testified, she was then physically unable to return because of her illness and unable to take up her household duties and cohabit with libellant, and also that on numerous occasions, the libellant had made remarks to the effect that she, respondent, was too friendly with the boarder at her mother's home. She admitted that during all the time that she and her husband lived together at her parent's home, he did not accuse her or make any assertions about her character. The alleged remarks concerning her relations with the boarder were therefore not the cause of her refusal to return to their common home.

Respondent had several witnesses who testified on her behalf. One Rose Bastianelli, a cousin of respondent, testified that at one time she met the libellant at her aunt's home and while alone in the parlor, she asked him whether he intended to make up with his wife, to which he merely answered "No", and no further discussion was had between them. She was not quite 17 years old at the time of the alleged conversation and gave no reason for asking this question, and stated that she had not communicated this conversation to the respondent until about a month prior to the hearing.

One Carolina Calderetta testified that she was just a friend and that at one time, the libellant and respondent were at her home and the libellant asked the respondent: "How are you?" and she answered "All right"; and the libellant answered, "Sure you are all right now since you have become a millionaire with John."

Respondent admitted that the alleged accusation that she was living with another man, did not prevent her from going back to her husband. She also admitted at the hearing before the master, that her condition of health was better.

Libellant testified that on July 14th, 1930, when he requested respondent to return to him, he had $800 in the bank. He was therefore abundantly able to provide for her and to avoid the drudgery of housework.

After a careful examination of the entire testimony, we are of the opinion that the libellant was very desirous of having his wife live with him; that at all times, he kept his home open for her return, and that his requests were made in good faith. We are further of the opinion that her refusal was not justified, and that she used her alleged illness only as an excuse for refusing to return.

We are of the opinion that respondent was guilty of wilful and malicious desertion on July 14th, 1930, and that the desertion has been continuous since said date, and that the same was without cause or justification.

We held in *MacDonald v. MacDonald*, 108 Pa. Superior Ct. 80 (83), 164 A. 830; "It is, of course, the duty of a wife to live with her husband at such reasonable place which he can according to his means provide as a home. Since it is the obligation of the husband to provide a home, his choice in the matter is controlling providing it is exercised in good faith."

In *Lyons v. Lyons*, 116 Pa. Superior Ct., 385, 176 A. 792, where on a libel for divorce on the ground of wil-

ful and malicious desertion, the respondent attempted to justify her action, we held in an opinion by our Brother BALDRIGE: "...... It was incumbent upon her to prove clearly such conduct upon the part of her husband as will warrant the dissolution of the marriage bond", citing *Strobel v. Strobel*, 100 Pa. Superior Ct. 536.

After a careful reading of the testimony, we are convinced that the conclusion reached by the master and lower court is correct.

The decree of the lower court granting the divorce is affirmed.