## Fawcett *v.* Fawcett, Appellant.

Argued April 23, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*William J. Graham,* with him *S. G. Alter* and *Joseph Bonidy,* for appellant.

*David Turets,* for appellee.

OPINION BY RENO, J., July 19, 1946:

The court below granted the husband a divorce upon the ground of indignities. The evidence disclosed that the parties were living together in a *rented* house at the time of the trial. The wife testified, and the libellant called in rebuttal did not deny, that the evening before the trial she prepared dinner for him. The law does not require that a spouse leave the common abode to qualify for a divorce for indignities, but failure to leave always raises a serious question as to the severity of the treatment to which a libellant has been subjected, and the degree by which his condition became intolerable and his life burdensome. *Cunningham v. Cunningham,* 119 Pa. Superior Ct. 380, 181 A. 458. In a day when elsewhere the dissolution of marriage has become increasingly easy, it is still the unbending rule of this Commonwealth that a divorce decree must be founded upon compelling, imperious reasons, and upon evidence that is clear and convincing. *Hartley v. Hartley,* 154 Pa. Superior Ct. 176, 35 A. 2d 591.

The parties were married in 1924, when libellant was thirty-nine years old, and his wife twenty-nine. She was the mother of two children, a daughter of eight and a son of ten, and the children became members of his family. He was a stoker operator, steadily employed, and apparently devoted to his wife and her children. She was, according to libellant's testimony, "nervous ever since she was a child going to school. She was known—they used to call her a 'bawl baby' in school", and it is quite clear that many of the incidents of their marital history arose out of her hysterical and neurotic condition. Indeed, the court below found that "she is ill and nervous", but added that her malady, "does not

explain nor excuse her conduct." Here the learned court fell into grave error. Nothing is better established in our law than that ill health both explains and excuses a wife's conduct, and that the acts of a spouse resulting from ill health do not furnish a ground for divorce. *Crock v. Crock,* 96 Pa. Superior Ct. 377; *Grey v. Grey,* 113 Pa. Superior Ct. 215, 172 A. 412; *Schulze v. Schulze,* 33 Pa. Superior Ct. 325. Whatever may be the form of the marriage ceremony, the celebrants in this Commonwealth take each other "for better, for worse, for richer, for poorer, in sickness and in health, to love and to cherish . . .": *Allen's Appeal,* 99 Pa. 196, 200, SHARSWOOD, C. J. "The situation of the husband doubtless is, and has been, a most unfortunate one, requiring patience and forbearance, but the law does not recognize this [ill health] as a ground for divorce": *Crock v. Crock,* supra, p. 383. And when, as here, a man marries a woman whom he knows is emotionally unstable and temperamental he must be taken to have engaged to shield her with his strength, to lighten the pathway in what for her is an ever troubled world, and to bear and forbear in the state he deliberately chose for himself.

Even so, the incidents of which libellant complains, are mostly trivial, and some of his own making. The first serious rift in their marital happiness occurred some six years ago when libellant found faults in the character and conduct of the young man who was courting his wife's daughter. The courtship proceeded in the tempo and atmosphere of this modern age, and the mother perhaps unwisely indulged her daughter's seeming indiscretions against the protest of her husband. Nevertheless, a happy marriage ensued, and even though it soured the libellant, it is difficult to understand how it could constitute an indignity to him. But it was the beginning of marital friction, and in its production he was not without fault.

The subsequent episodes, which need not be reviewed in detail, are not of greater consequence. The record is

not too clear whether libellant's testimony relates to events before or after the filing of the libel. Injurious conduct occurring after a libel is filed is relevant as shedding light upon the preëxisting atmosphere, *Martin v. Martin*, 157 Pa. Superior Ct. 538, 43 A. 2d 637, but it must not be supposed that the tranquillity of a naturally temperamental woman will be recovered by the action of a man who continues to live with her for eight months after he has filed a libel. Thus, he complains because "she hasn't said anything to me in the past three or four months." How he could expect her to be conversationally nimble while he was seeking a divorce passes all understanding. The learned trial judge made no finding upon her credibility but from "the manner in which she spoke about him" he drew the conclusion: "She seems to loathe him and hold him in contempt." The demeanor of a witness is indeed the touchstone of credibility, *Smith v. Smith*, 157 Pa. Superior Ct. 582, 43 A. 2d 371, but her manner of testifying cannot, in the circumstances of this case, supply the base for an inference of loathing and contempt, and it certainly does not support the conclusion that she engaged in a course of conduct which the law denominates indignities. Some allowance must be made for the outraged feelings and the natural resentment of a woman, who the night before she confronted her husband in court served a meal for him, and with whom she was obliged to live during the whole of the period he was seeking dissolution of the marital tie.

All the other charges evaporate upon close inspection. There is, for instance, her refusal to sign the application for the 1944 automobile license which here and in the court below was stressed as libellant's major complaint. At first blush, it does seem, as the court below found, that her action which obliged him to walk a half mile to his work was unjustified, and that she refused because she wished: "To spite her husband and make his life burdensome". But according to her testimony,

and it was not denied by him, title to the automobile was placed in her name not only to conceal it from his creditors, but also because he had expressly made a gift of it to her. She testified: "it was not the idea of signing the license so much [as] that he demanded that I turn the title back over" and "because he was not doing anything for me at the time and he would not give me any money to buy anything." Her uncontradicted testimony effectually eliminates the element of spite, and in view of his failure to provide properly for her support, her refusal was a natural reaction, and a reasonable retaliation. It did not constitute an indignity.

The record taken as a whole does not reveal a course of conduct indicating hate and estrangement. If the acts of which he complains were not provoked by libellant, they were at most the occasional outbursts of an emotionally unhinged woman. The cardinal error of the court below was the failure to take into the account respondent's physical and mental ailments, and for that reason, among others, the record will not support a decree.

Decree reversed, and libel dismissed.